UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JAMES M. MALONEY,

                              Plaintiff,

              -against-                                      **MEMORANDUM AND ORDER**

THE COUNTY OF NASSAU, THE POLICE                            03-CV-4178 (SLT)(MLO)
DEPARTMENT OF THE COUNTY OF NASSAU,
DENIS DILLON, in his official capacity as District
Attorney of the County of Nassau, JOAN P. YALE,
ROBERT SEIDEN, ESQ., JOHN A. JOHNSON,
in his official capacity as Commissioner of the State of
New York Office of Children and Family Services,
DAVID R. PETERS, in his official capacity as
Director of the State Central Register of the State of
New York Office of Children and Family Services,
and JOHN DOES No. 1 through 100,

                              Defendants
-------------------------------------------------------------------x
**TOWNES, United States District Judge:**

        Plaintiff James M. Maloney brings this action pursuant to 42 U.S.C. § 1983, alleging that

defendants violated his civil rights during and after an incident which began in the afternoon on

August 23, 2000, and ended in the early morning of August 24, 2000 (hereinafter, the

"Incident").  All of the named defendants have now filed dispositive motions.  In addition,

defendant Seiden has filed a motion pursuant to Fed. R. Civ. P. 15(a) to amend his answer and a

motion for sanctions pursuant to Fed. R. Civ. P. 11.  For the reasons set forth below, the latter

two motions are denied without prejudice, and defendants' dispositive motions are granted in

part and denied in part.

                              *BACKGROUND*

        Although there are some disputes concerning exactly what transpired during the Incident

at issue in this case, the following facts are not in dispute.  Around 2:00 p.m. on August 23,

2000, plaintiff spotted a Verizon employee atop a telephone pole located on the curtilage of

plaintiff's home in Port Washington, New York (County Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 ("County 56.1 Statement") at ¶ 1; Plaintiff's Declaration in Opposition to County Defendants' Statement of Material Facts ("Pl. 56.1 Counterstatement") at ¶ 1). Plaintiff engaged the employee in a conversation and, thereafter, observed him with the aid of a scope of some sort (*Id.*).

About half an hour after the telephone worker left, two men dressed in plain clothes drove up to plaintiff's home in a van. These men told plaintiff that they were police officers and that a telephone worker had complained that plaintiff had threatened him with a rifle. Although the men demanded that plaintiff come outside, plaintiff refused to do so (County 56.1 Statement; Plaintiff's First Amended Complaint ("Am. Compl.") at ¶¶ 29-30).

These officers then summoned addition officers and a hostage negotiation team from the Nassau County Police Department (County 56.1 Statement at ¶ 2; Pl. 56.1 Counterstatement at ¶ 2). Over the ensuing twelve hours, the team spoke to plaintiff by telephone and attempted to persuade him to exit the house and surrender. During this time, plaintiff was permitted to speak to an attorney, Robert Seiden (County 56.1 Statement at ¶ 6; Pl. 56.1 Counterstatement at ¶ 6). At around 2:00 a.m. on August 24, 2000, plaintiff surrendered to the police (County 56.1 Statement at ¶ 9; Pl. 56.1 Counterstatement at ¶ 9). Shortly thereafter, numerous police officers entered plaintiff's home, where they forcibly opened a locked safe and seized various items of property (County 56.1 Statement at ¶¶ 12-13; Pl. 56.1 Counterstatement at ¶¶ 12-13).

Following his arrest, plaintiff was sent to a mental hospital, where he spent the night (County 56.1 Statement at ¶ 11; Am. Compl. at ¶ 50). Plaintiff was eventually charged with several criminal offenses (County 56.1 Statement at ¶ 10; Pl. 56.1 Counterstatement at ¶ 10), but the Nassau County District Attorney's Office subsequently permitted him to plead guilty to

disorderly conduct, a violation, in full satisfaction of the charges (County 56.1 Statement at ¶ 14; Pl. 56.1 Counterstatement at ¶ 14).  However, because plaintiff's young sons had been home at the time of the Incident, the New York State Office of Children and Family Services ("OCFS") investigated plaintiff for possible child abuse (State Defendants' Statement of Material Facts Pursuant to Rule 56.1 ("State 56.1 Statement") at ¶¶ 1-2; Am. Compl. at ¶ 40).  Following this investigation, OCFS determined that child abuse was "indicated" (State 56.1 Statement at ¶ 2; Am. Compl. at ¶ 55).  Thereafter, plaintiff wrote to OCFS, requesting that the records be amended by changing "indicated" to "unfounded – legally sealed" (State 56.1 Statement at ¶ 3; Am. Compl. at ¶ 58).  In September 2001, David R, Peters, the Director of the New York State Central Register of Child Abuse and Maltreatment, responded by sending plaintiff a letter which stated, among other things:

> If the record is not amended within 90 days of receiving the request, or if your request is denied after the administrative review, your request will be forwarded to the Bureau of Special Hearings for the scheduling of a fair hearing.

Ex. D to Declaration of Asst. Atty. Gen. Lori L. Pack; Am. Compl. at ¶ 59.  Approximately two years later, when plaintiff had yet to receive the "fair hearing" promised by Peters, plaintiff commenced this action pursuant to 42 U.S.C. § 1983 ("§ 1983").

### *Plaintiff's Pleadings*[1]

Plaintiff's First Amended Complaint ("Amended Complaint") provides a fairly detailed account of plaintiff's version of the Incident.  Plaintiff alleges that the telephone worker, later identified as Michael Cates, refused to identify himself by anything other than his first name

---

[1]On December 10, 2003, plaintiff's counsel amended the pleading.  Since this motion relates solely to the First Amended Complaint, it is unnecessary to describe plaintiff's original pleading or the ways in which it differed from the First Amended Complaint,  which is discussed below.

(Am. Compl. at ¶¶ 22, 28). Plaintiff further alleges that the scope he used to observe Cates was only "a small low-power telescope," and that plaintiff put the telescope away as soon as Cates observed him using it (*Id.* at ¶ 23). According to plaintiff, Cates demanded to know what plaintiff had pointed at him (*Id.* at ¶ 24). After plaintiff assured him that it was "nothing harmful," Cates allegedly worked for another five to seven minutes before descending the pole (*Id.* at ¶ 26).

The First Amended Complaint acknowledges that the men who arrived in the van about 2:30 p.m. on August 23, 2000, stated that they were police officers who had received a complaint from a telephone worker alleging that plaintiff had threatened him with a rifle. (*Id.* at ¶ 29). Plaintiff denied doing so and, speaking from an upstairs window, attempted to explain what had happened (*Id.* at ¶ 30). When one of the men interrupted and asked plaintiff to come outside to talk to them (*id.*), plaintiff demanded to know if they were federal or state officers. (*Id.* at ¶ 31). The man replied, "Both,"making plaintiff suspect that the men were not actually police officers (*Id.* at ¶ 32).

Shortly after plaintiff refused the officers' demand that he come outside, plaintiff's house "was surrounded by teams of armed police." (*Id.* at ¶ 33). The police cut plaintiff's telephone lines, but permitted plaintiff to speak with them by telephone (*Id.*). At some point, the police permitted plaintiff to speak with Seiden. The First Amended Complaint alleges that Seiden "professed to be acting on Plaintiff's behalf as Plaintiff's attorney" (*id.* at ¶ 35), and that plaintiff "acknowledged that Seiden was representing him as his attorney" (*Id.* at ¶ 36).

Over the ensuing 12 hours, the police repeatedly demanded that plaintiff exit the house and surrender (*Id.* at ¶ 38). Plaintiff, who denied having done anything wrong, refused to do so (*Id.* at ¶ 38). Aware that *Payton v. New York*, 445 U.S. 573, 576 (1980), prohibited warrantless

arrests in the home, plaintiff insisted that the police obtain a warrant. (*Id.* at ¶¶ 32, 38). However, the police never did so (*Id.* at ¶ 39).

During the Incident, Seiden repeatedly advised plaintiff that the police were preparing to break down the door and storm the house (*Id.* at ¶ 40). Seiden stated, and plaintiff recognized, that there was a possibility that plaintiff's wife and infant sons might be injured in the process (*Id.* at ¶ 41). Seiden also assured plaintiff that he "would see to it that no illegal searches and seizures occurred" (*Id.* at ¶ 42).

Shortly after 2:00 a.m. on August 24, 2000, plaintiff, allegedly unable to bear the "continued threat of . . . harm to [his] family" (*id.* at ¶ 41), stepped outside and surrendered to the police (*Id.* at ¶ 42). Shortly thereafter, personnel from the Nassau County Police Department entered plaintiff's home without a warrant and without consent (*Id.* at ¶¶ 45-48). Defendant Joan P. Yale, who is identified in the Amended Complaint only as a police "official" (*id.* at ¶ 9), allegedly informed plaintiff's wife that Seiden had "withdrawn" from the case and that plaintiff would need another criminal defense attorney (*Id.* at ¶ 45). Other officers – John Does 2 through 100 – searched the house and seized "property, papers and effects, including each and every locked box in the home" (*Id.* at ¶ 46). Among the closed containers opened and searched by the police was plaintiff's safe, which was destroyed in the process (*Id.*).

Later on August 24, 2000, while involuntarily confined at Nassau County Medical Center (now known as Nassau University Hospital), plaintiff refused the hospital staff's request for a urine sample (*Id.* at ¶ 51). Plaintiff was thereafter restrained and "choked into unconsciousness" and threatened with further violence by a Nassau County Police paramedic, defendant John Doe No. 1 (*Id.* at ¶ 53).

The Amended Complaint implies that plaintiff was charged with criminal offenses

stemming from the incident of August 23-24, 2000 (*id.* at ¶ 61), but does not specify the charges. On or about January 28, 2003, plaintiff entered into a plea agreement with the Nassau County District Attorney's Office under which plaintiff was permitted to plead guilty to a violation in satisfaction of the charges against him (*Id.*). As part of that plea agreement, the District Attorney's Office agreed to return all of the papers and property seized from plaintiff's home, with the exception of certain items listed in the agreement but not specified in the Amended Complaint (*Id.*). Plaintiff alleges that he has yet to receive any of the papers and property from the District Attorney, notwithstanding correspondence from plaintiff and his attorney reminding the District Attorney's Office of its agreement (*Id.* at ¶¶ 62-63).

Plaintiff was also investigated by OCFS, which looked into allegations that plaintiff's actions on August 23-24, 2000, resulted in maltreatment of his infant sons (*Id.* at ¶ 54). That investigation concluded that maltreatment was "indicated" (*Id.* at ¶ 55). As a result, plaintiff was listed on the New York State Child Abuse and Maltreatment Register ("the Register") (*Id.* at ¶¶ 56-57).

Sometime thereafter, plaintiff requested in writing that "the record about him in the Register be amended from "Indicated" to "Unfounded Legally Sealed" (*Id.* at ¶ 58). On September 5, 2001, the Director of the Register, defendant David R. Peters, sent plaintiff a letter promising to undertake an administrative review in response to plaintiff's letter (*Id.* at ¶ 59). That letter stated that if plaintiff's request was denied or if the record was not amended within 90 days, plaintiff's request would be "forwarded to the Bureau of Special Hearings," which would schedule a hearing (*Id.*). However, plaintiff's record was never amended and, as of the date of plaintiff's Amended Complaint, no hearing had yet been scheduled (*Id.* at ¶ 60).

In his Amended Complaint, plaintiff alleges five causes of action. In the first of these,

plaintiff alleges that Seiden, Nassau County, Nassau County District Attorney Denis Dillon, the Nassau County Police Department and its employees, Yale and Does 2 through 100, "deprived Plaintiff of his rights under the Fourth and Fourteenth Amendments" of the United States Constitution (*Id.* at ¶ 65). Plaintiff seeks compensatory damages from all defendants, plus punitive damages from Seiden alone (*Id.* at ¶¶ 66-67).

Plaintiff's second cause of action alleges that the actions of the Nassau County paramedic, John Doe No. 1, violated his "rights under the NYS and federal constitutions" (*Id.* at ¶ 70). Plaintiff does not seek to recover damages from John Doe No. 1, but seeks damages from Nassau County (*Id.* at ¶ 71).

In his third cause of action, plaintiff alleges that Seiden, Nassau County, Nassau County District Attorney Denis Dillon, the Nassau County Police Department and its employees, Yale and Does 2 through 100, "jointly and severally illegally seized and retained property, personal effects, and papers taken by defendants from plaintiff" and have thereby deprived plaintiff of his rights under the Fifth and Fourteenth Amendments of the federal Constitution (*Id.* at ¶¶ 74, 76). In addition, plaintiff alleges that these defendants' actions constitute conversion and "trespass to chattels" under New York State law (*Id.* at ¶¶ 77-78). Plaintiff seeks an accounting and the return of his property, plus compensatory damages from all defendants and punitive damages from Seiden (*Id.* at ¶¶ 79-84).

The fourth cause of action alleges that defendant John A. Johnson, the Commissioner of OCFS, and David R. Peters, the Director of the Register, "have deprived and continue to deprive Plaintiff of his rights under the First, Second, Sixth, Eighth and Fourteenth Amendments" of the United States Constitution (*Id.* at ¶ 87). Plaintiff does not expressly state the basis for his First, Second, Sixth and Eighth Amendment claims, but specifically alleges that he has "a protectable

liberty interest in his name not being on 'The Register'" and that Johnson and Peters, acting under color of state law and under official policy, "have violated and continued [sic] to deprive plaintiff of his liberty interests" (*Id*. at ¶¶ 88-89). In addition, plaintiff alleges that the Second Circuit has "held unconstitutional the NYS statutory scheme whereby persons are listed on 'The Register,'" and that Johnson and Peters "knew or should have known" of this ruling (*Id*. at ¶¶ 90-91). Plaintiff does not seek damages against Johnson or Peters, but seeks a declaratory judgment stating that the Register is unconstitutional, an injunction prohibiting Johnson and Peters from listing plaintiff's name on the Register, and an order expunging all records concerning plaintiff from the files of the OCFS and the Register (*Id*. at ¶¶ 92-94).

Finally, in his fifth cause of action, plaintiff alleges that Seiden intentionally breached fiduciary and legal obligations that he owed to plaintiff. Plaintiff alleges that Seiden not only had such obligations under the New York State Code of Professional Conduct, but also owed a "common law fiduciary duty" to plaintiff (*Id*. at ¶¶ 97-98). As with every other count naming Seiden as a defendant, this cause of action seeks both compensatory and punitive damages (*Id*. at ¶¶ 100-01).

### *The Defendants' Motions*

All of the named defendants have now filed dispositive motions. Defendants County of Nassau, the Police Department of the County of Nassau, Nassau County District Attorney Denis Dillon and Joan P. Yale (collectively, the "County Defendants") move pursuant to Federal Rules of Civil Procedure 12(c) and 56 to dismiss the causes of action against them. Defendant Robert Seiden, Esq., also moves pursuant to Rules 12 and 56 to dismiss the causes of action against him, but has filed additional motions seeking to amend his answer to add two affirmative defenses and to impose sanctions on plaintiff pursuant to Fed. R. Civ. P. 11. Finally, defendants John A.

Johnson and David R. Peters (collectively, the "State Defendants") move to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6).

## I. *The County Defendants' Motion*

The County Defendants originally sought permission to move to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(c). *See* Letter to Hon. Leonard D. Wexler from Tatum J. Fox, Esq., dated April 21, 2004. Now, however, the County Defendants move to dismiss the claims against them pursuant to both Rules 12(c) and 56 of the Federal Rules of Civil Procedure. Judge Wexler's Rules and this Court's own Individual Motion Practices require that, before making a motion pursuant to Rule 56, a party must send a pre-motion conference request explaining the bases of the proposed motion. Since the County Defendants' pre-motion conference request did not seek permission to move for summary judgment, this Court will treat the County Defendants' motion as having been brought solely pursuant to Rule 12(c).

In deciding a motion for judgment on the pleadings pursuant to Rule 12(c), courts apply the same standard that is used to decide a motion to dismiss under Rule 12(b)(6). *See Greco v. Trauner, Cohen & Thomas, L.L.P.*, 412 F.3d 360, 363 (2d Cir. 2005); *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all of the factual allegations in the complaint as true and must draw all reasonable inferences in the plaintiff's favor. *See Erickson v. Pardus*, ___U.S.___, ___, 127 S.Ct. 2197, 2200 (2007); *Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006). A court must then determine whether a plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Twombly v. Bell Atlantic Corp.*, ___U.S.___, ___, 127 S.Ct. 1955, 1974 (2007).

While a complaint "does not need detailed factual allegations," *id.* at 1964, it nonetheless

must give the defendant(s) "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 127 S.Ct. at 2200. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964-65 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). As the Second Circuit recently stated, the "flexible 'plausibility standard'" enunciated in *Twombly* "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis added).

Because "a Rule 12(b)(6) motion challenges the facts alleged on the face of the complaint . . . or, more accurately, the sufficiency of the statements in the complaint," *see Cortec Indus., Inc. v. Sum Holding L.P*, 949 F.2d 42, 47 (2d Cir. 1991) (internal citations omitted), *cert. denied*, 503 U.S. 960 (1992), a court deciding such a motion "is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). However, in some circumstances, a court may consider documents other than the complaint. For example, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered. *Id.* (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1997), *cert. denied*, 525 U.S. 1103 (1999)). In addition, a document which is not attached to, or incorporated by reference in, the complaint may be considered if the complaint "solely relies" on the document and it is "integral to the complaint." *Id.* (quoting *Cortec Indus.*, 949 F.2d at 47) (emphasis omitted). If "matters outside the pleading are presented to and not excluded by the court," a court should convert the motion to one for summary judgment and give "all parties . . . [a] reasonable opportunity to present all material

made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b).

In their motion pursuant to Rule 12(c), the County Defendants raise four "Points." First, these defendants argue that plaintiff's §1983 claims must be dismissed because plaintiff cannot make out a violation of any of his federal Constitutional rights. Second, they assert that the §1983 claims against Nassau County and the Nassau County Police Department must be dismissed because plaintiff has not alleged that the Constitutional violations are due to a municipal policy. Third, these defendants argue that plaintiff's state-law claims are barred because plaintiff has not filed a notice of claim, as required under New York General Municipal Law. Finally, they allege that the individually named County Defendants enjoy qualified immunity.

The County Defendants' motion papers also include a fifth argument, which is contained in a footnote in the Memorandum of Law in Support of County Defendants' Motion for Summary Judgment ("County Memo"). That footnote asserts that plaintiff has failed to state any cause of action concerning defendant Yale. Specifically, the County Defendants contend that the only allegation concerning this defendant is that she "entered Plaintiff's home and informed Plaintiff's wife that Seiden had 'withdrawn' from the case and that Plaintiff would need another criminal defense attorney." *See* County Memo at 13, n. 6 (quoting Am. Compl. at ¶ 45). This argument, along with the other four Points, are discussed below.

## A. *The Arguments relating to § 1983*

The County Defendants' first, second and fifth arguments relate to § 1983. This section itself "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied*,

512 U.S. 1240 (1994). Accordingly, in order to maintain a § 1983 action, a plaintiff must allege both that the conduct complained of (1) was "committed by a person acting under color of state law" and (2) "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Moreover, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Plaintiff cannot base a defendant's liability on *respondeat superior* or on "linkage in the ... chain of command." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

### 1. The Alleged Constitutional Violations

The County Defendants' first argument, that "plaintiff's claims based upon an alleged violation of his Constitutional rights cannot be sustained as a matter of law," County Memo at 6, essentially asserts that the Amended Complaint has not adequately alleged violations of plaintiff's federal Constitutional rights. However, because the Amended Complaint is unclear – alleging unspecified violations of plaintiff's Fourth and Fourteenth Amendments right in the first cause of action and unspecified violations of plaintiff's Fifth and Fourteenth Amendment rights in the third cause of action – the County Defendants' first argument addresses various conceivable Constitutional violations. Specifically, the County Defendants argue (1) that the presence of police outside plaintiff's home did not violate his Constitutional rights, (2) that plaintiff cannot allege false arrest because the police had probable cause to arrest him, (3) that the search of plaintiff's home was consensual and (4) that plaintiff consented to the destruction and forfeiture of seized property.

At oral argument, plaintiff's counsel clarified that he was not alleging false arrest. *See*

Transcript of Oral Argument, at 6. Accordingly, there is no need to address the question of whether there was probable cause to arrest plaintiff. However, plaintiff's counsel articulated two alleged Constitutional violations: the warrantless and allegedly nonconsensual search of plaintiff's home and the "unconstitutional manner in which [plaintiff] was asked to come out of his house." *Id.* Therefore, this Court need evaluate only the allegations concerning these two purported violations to determine whether plaintiff has stated a claim under § 1983.

This Court agrees with plaintiff that both of these violations are properly alleged in the Amended Complaint. With respect to the search of plaintiff's home, that pleading alleges that members of the Nassau County Police Department entered the home without a warrant and without consent and "seized property, papers and effects, including each and every locked box in the home," and seized "the contents of Plaintiff's safe by destructive entry therein." Am. Compl. at ¶¶ 46-48. In addition, plaintiff's Amended Complaint alleges that there were no exigent circumstances which would excuse the failure to obtain a search warrant or plaintiff's consent. These allegations adequately allege unlawful search and seizure in violation of the Fourth Amendment of the U.S. Constitution, as extended to the State under the Fourteenth Amendment.

The County Defendants do not argue that the allegations in the complaint are insufficient, but contest the veracity of the plaintiff's claim that the search was without consent. To that end, the defendants have submitted three documents, each of which appears to be signed by plaintiff's wife, Debra R. Comer, and purports to give her consent to search portions of plaintiff's home. However, this Court cannot consider these documents upon this Rule 12(c) motion. *See Roth*, 489 F.3d at 509. While this Court could elect to convert this motion to one for summary judgment and afford plaintiff the opportunity to submit additional evidence, *see* Fed. R. Civ. P. 12(b), this Court declines to do so. It is readily apparent from the face of the documents and

from the Declaration of Debra R. Comer, which was submitted as part of plaintiff's opposition papers, that there are substantial issues concerning the scope, voluntariness and validity of Ms. Comer's consent. These are best addressed on a motion for summary judgment.

With respect to plaintiff's claim that the manner in which he was arrested was unconstitutional, this Court understands plaintiff to be asserting that his warrantless arrest violated his Fourth and Fourteenth Amendment rights under *Payton v. New York*, 445 U.S. 573, 576 (1980). While *Payton* itself stated that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *id.* at 585-86, and that the "Fourth Amendment has drawn a firm line at the entrance to the home," the threshold of which "may not be crossed without a warrant," *id.* at 590, the fact that plaintiff was arrested outside of his home is not necessarily fatal to plaintiff's *Payton* claim. Several circuit courts have applied *Payton* in instances in which the police never physically crossed the threshold but, through threats of force, compelled an individual to exit his home and surrender. *See Sharrar v. Felsing*, 128 F.3d 810, 819-20 (3d Cir. 1997); *United States v. Maez*, 872 F.2d 1444, 1450-51 (10th Cir. 1989); *United States v. Al-Azzawy*, 784 F.2d 890, 893 and n.1 (9th Cir. 1985), *cert. denied*, 476 U.S. 1144 (1986); *United States v. Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984), *cert. denied*, 471 U.S. 1061 (1985). All of these cases are similar to the case at bar in that they involved instances in which the police surrounded the defendants' home, then used actual or implied threats of violence to coerce a surrender outside of the home. These courts reasoned that, since a seizure occurs within the meaning of the Fourth Amendment when "a reasonable person would have believed that he [or she] was not free to leave," *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984), the arrests occurred while the defendant was still inside the home because no reasonable person would have believed that he or she was free to remain there. *Sharrar*, 128 F.3d at 819-20

14

("when a SWAT team surrounds a residence with machine guns pointed at the windows and the persons inside are ordered to leave the house backwards with their hands raised, an arrest has undoubtedly occurred"); *Maez*, 872 F.2d at 1451 (where a defendant is coerced to leave his home, the privacy of the home is effectively invaded); *Al-Azzawy*, 784 F.2d at 893 (any reasonable person whose trailer was completely surrounded by police with their weapons drawn, and who was ordered to leave the trailer and drop to his knees, would have believed he was under arrest); *Morgan*, 743 F.2d at 1166 (arrest of the defendant, who "appeared at the door [of a private home] *only because of* the coercive police behavior taking place outside of the house," occurred "while the defendant was inside a private home").

At least one district court in this Circuit has expressly adopted the reasoning of these cases. In *United States v. Gori*, No. 98 Cr. 1163 (RPP), 1999 WL 322651 (S.D.N.Y. May 20, 1999), as in this case, the arresting officers never crossed the threshold. Rather, the officers waited until the occupants opened the front door to receive a food delivery and, standing just outside the doorway with their guns drawn, ordered the evacuation of the apartment. The district court, citing *Maez*, *Al-Azzawy* and *Morgan* with approval, held that "a seizure of [the defendants in that case] occurred when they were inside the apartment and ordered by armed police officers to exit." *Id.* at *8.

On appeal, the Second Circuit reversed on other grounds, holding that once the occupants had voluntarily opened the door to the apartment, no warrant was required "to 'temporarily' seize the occupants and conduct a limited investigation." *United States v. Gori*, 230 F.3d 44, 53 (2d Cir. 2000), *cert. denied sub. nom. Pichardo v. United States*, 534 U.S. 824 (2001). While noting that the *Payton* rule is "directed primarily at warrantless *physical* intrusion into the home," *id.* at 51 (emphasis in original), the Second Circuit found it "unclear whether *Payton*'s

solicitude is aroused when a dwelling is penetrated by the voice of a police officer standing outside." *Id.* However, given "narrow question raised by the distinctive facts" of that case, the Court expressly declined to "consider the questions presented when the police surround a dwelling, flood it with searchlights, and order evacuation over a bullhorn." *Id.* at 52, n.2.

Although the Second Circuit has not yet recognized a *Payton* violation in the absence of a warrantless physical intrusion into the home, there is nonetheless ample authority supporting such a position. While plaintiff's papers do not specifically cite to *Gori*, *Sharrar*, *Maez*, *Al-Azzawy* or *Morgan*, plaintiff expressly alleges a *Payton* violation and has pled facts which support such a claim. The Amended Complaint alleges that plaintiff's home "was surrounded by teams of armed police," who "repeatedly demanded that Plaintiff leave his home and surrender into their custody." Am. Compl. at ¶¶ 33, 38. When plaintiff refused to comply with these demands, he was allegedly "advised . . . that the police were preparing to break down the door and 'storm' the house," and that his family might be hurt in the process. *Id.* at ¶ 40. Plaintiff expressly alleges that it was "[t]he continued threat of such harm to Plaintiff's family" that caused plaintiff to leave his home and surrender to the police. *Id.* at ¶ 41. In addition, plaintiff alleges that the police "performed the aforesaid acts under non-exigent circumstances." *Id.* at ¶ 49. In light of these allegations and the arguable nature of plaintiff's *Payton* claim, the County Defendants' motion to dismiss the first and third causes of action on the ground that plaintiff fails to state a federal Constitutional violation is denied.

## 2. The Allegations concerning Municipal Policy

The County Defendants' second argument is that the §1983 claims against Nassau County and the Nassau County Police Department must be dismissed because plaintiff has not alleged that the Constitutional violations are due to a municipal policy. Municipalities cannot be

liable under a theory of *respondeat superior*. *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978). In *Monell* and subsequent cases, the Supreme Court has "required a plaintiff seeking to impose liability on a municipality under §1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of County Comm'rs of Bryan County, Okla.*, 520 U.S. at 403. A plaintiff seeking to hold a city liable for the unconstitutional acts of its employees must, therefore, plead and prove three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

In order to adequately plead the first element, "a plaintiff must allege: (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees." *McCrary v. County of Nassau*, 493 F. Supp. 2d 581, 588 (E.D.N.Y. 2007) (citing *Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996); *see also Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 478 (E.D.N.Y.2002). Mere assertions that a municipality has a custom or policy of violating constitutional rights are insufficient to state a Section 1983 claim, unless a plaintiff alleges facts "tending to support, at least circumstantially, such an inference." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d

Cir.1993).

Although plaintiff in this case alleges that various County Defendants were acting "pursuant to official policy," Am. Compl. at ¶¶ 6, 13, 18, and that defendant John Doe No. 1, the paramedic, was acting "pursuant to his official duties," *id.* at ¶ 53, plaintiff's Amended Complaint does not even identify a municipal policy or custom that resulted in the alleged Constitutional violations. Moreover, the Amended Complaint does not allege facts which suggest the existence of a municipal policy or custom. At most, plaintiff's pleading describes a single incident in which municipal employees allegedly violated plaintiff's Constitutional rights. However, proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). Accordingly, plaintiff's claims against Nassau County and the Nassau County Police Department are dismissed.

In this connection, this Court recognizes that defendant Yale, as a police "official," may qualify as a municipal policymaker. However, there is no specific allegation in the Amended Complaint that she personally took actions or made decisions which resulted in the alleged Constitutional violations, or that she failed to adequately supervise her subordinates. Rather, the only allegations concerning Yale are that she entered plaintiff's home, informed plaintiff's wife that Seiden had "withdrawn" from the case and that plaintiff would need another criminal defense attorney, and participated in the illegal seizure and retention of plaintiff's property, Am. Compl. at ¶¶ 45, 74.

## 3. *The Allegations against Defendant Yale*

With respect to the County Defendants' fifth argument, this Court agrees with the

defendants that plaintiff's allegations concerning Yale's conversation with Comer do not make out a Constitutional violation. On the other hand, allegations that Yale entered plaintiff's home without a warrant and without consent, then illegally seized items from the home, are sufficient to allege that Yale violated plaintiff's Fourth and Fourteenth Amendment rights to be free from illegal searches and seizures. Therefore, to the extent that the County Defendants are moving to dismiss all claims against defendant Yale on the ground that plaintiff has not adequately alleged the she violated his Constitutional rights, that motion is denied.[2]

## B. Notice of Claim Requirements

The County Defendants' third argument is that plaintiff's state-law claims are barred because plaintiff has not filed a notice of claim, as required under New York General Municipal Law. In his response, plaintiff does not controvert the assertion that he has failed to file a notice of claim. Rather, plaintiff raises what he characterizes as an issue "of first impression," urging this Court to rule "that supplemental claims brought under federal question cases where the main claim is under § 1983 must not be subject to the Notice of Claim requirement under any state's laws." Memorandum of Law in Opposition to Defendants' Motions ("Opp. Memo") at 12. Principally relying on *Felder v. Casey*, 487 U.S. 131 (1988), plaintiff asserts that State notice of claim requirements are procedural, and that "federal law controls the procedural aspects of cases brought under federal question jurisdiction." Opp. Memo. at 9.

Plaintiff, however, misconstrues the holding of *Felder*. In that case, the Supreme Court held that a Wisconsin notice-of-claim statute did not bar a § 1983 claim brought in State court against the City of Milwaukee and certain of its police officers. The *Felder* Court reasoned that

---

[2] Even if plaintiff's Amended Complaint failed to state a claim against Yale, this Court would be reluctant to grant any relief on the strength of a single sentence contained in a footnote. *See* Local Civil Rule 7.1.

applying notice requirements simply because the § 1983 claim was filed in state, rather than federal court would "burden[] the exercise of a federal right by forcing civil rights victims who seek redress in state courts to comply with a requirement that is entirely absent from civil rights litigation in federal courts." *Felder*, 487 U.S. at 141. Recognizing that the enforcement of notice-of-claim statutes in § 1983 actions brought in state courts would "frequently and predictably produce different outcomes in federal civil rights litigation based solely on whether that litigation takes place in state or federal court," the Court ruled that states could not "apply such an outcome-determinative law when entertaining substantive federal rights in their courts." *Id.*

These same problems would arise if federal courts were to refuse to apply notice-of-claim statutes to state-law claims over which they exercised pendent jurisdiction. As the Supreme Court has long recognized, "when a federal court exercises . . . pendent jurisdiction over state-law claims, 'the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.'" *Felder*, 487 U.S. at 151 (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945)). If this Court were to refuse to apply notice-of-claim requirements to pendent state claims, the outcome of such claims would differ depending solely on the court in which the claims were filed.

Contrary to plaintiff's assertion, this is hardly an issue of "first impression." Opp. Memo at 12. It is already "the general rule that in a federal court, state notice-of-claim statutes apply to *state*-law claims." *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (emphasis in original). Indeed, there are several recent cases in this Circuit which note that "[t]he notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Grennan v. Nassau County*, No. 04-2158 (DRH)(WDW),

2007 WL 952067, at *17 (E.D.N.Y. Mar. 29, 2007) (quoting *Warner v. Village of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003)); *see Fair v. Weiburg*, No. 02-CV-9218 (KMK), 2006 WL 2801999, at *10 (S.D.N.Y. Sept. 28, 2006).

As the County Defendants correctly note, no state claims can be brought against a county or any officer, agent or employee thereof unless a notice of claim has been served on the county in compliance with New York General Municipal Law § 50-e. *See* N.Y. Gen. Mun. Law § 50-i(1). Section 50-e requires that a plaintiff file a notice of claim prior to the commencement of an action and serve the notice of claim within 90 days after the claim arises. Plaintiff's opposition papers, which argue that no such notice is necessary, tacitly concede that no such notice was filed. Accordingly, all of plaintiff's pendent state claims against the County Defendants are dismissed.

## C. Qualified Immunity

Finally, the County Defendants argue that the individually named defendants are entitled to qualified immunity. Government officers are entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even where the law is "clearly established," officers are entitled to qualified immunity if it was "objectively reasonable" to believe that their actions were lawful at the time they acted. *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993). In either event, however, this defense generally "turns on facts not apparent from the face of [the] complaint." *Levine v. Lawrence*, No. 03 Civ. 1694, 2005 WL 1412143, at *10 (E.D.N.Y. June 15, 2005). Because this defense "necessarily involves a fact-specific inquiry, '[i]t is generally premature to address the defense of qualified

immunity in a motion to dismiss . . . .'" *Bernstein v. City of New York*, No. 06 Civ. 895 (RMB), 2007 WL 1573910, at *9 (S.D.N.Y. May 24, 2007) (quoting *Walker v. Mendoza*, No. 00 Civ. 93, 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000)).

In this case, the County Defendants made their qualified immunity argument before they were even certain what claims plaintiff was attempting to raise. Moreover, the qualified immunity argument relies on evidence which is outside the four corners of the complaint and cannot otherwise be considered upon a motion to dismiss. For example, in support of their argument that the police reasonably believed they had consent to search plaintiff's home, the County Defendants introduce copies of consents to search and imply that these were knowingly and voluntarily executed by plaintiff's wife. *See* County Memo at 13. Similarly, in support of their argument that exigent circumstances justified their actions to force plaintiff from his home, the County Defendants rely on Cates' supporting deposition and other evidence suggesting that plaintiff posed an immediate danger to himself and others. *Id.*

For these reasons, it is premature to consider the County Defendant's qualified immunity defense at this juncture. Upon the completion of discovery, the County Defendants may seek permission to renew this argument upon a motion for summary judgment.

## II. Seiden's Motions

Seiden has filed two separate motions. In his first motion, Seiden moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56. Seiden's first motion also seeks permission, pursuant to Fed. R. Civ. P. 15(a), to amend Seiden's answer to add two affirmative defenses. In a second motion, Seiden separately moves for sanctions pursuant to Fed. R. Civ. P. 11 on the ground that plaintiff's claims against

Seiden are frivolous.

As noted at the beginning of this Court's discussion of the County Defendants' motions, both Judge Wexler's Rules and this Court's own Individual Motion Practices require that a party seek and obtain permission to file a motion pursuant to Rule 56. While the docket sheet suggests that Seiden was granted permission to move to dismiss, there is nothing to suggest that he was also granted permission to move for summary judgment. In addition, there is nothing to suggest that Seiden ever sought permission to move to amend his pleadings, as required by this Court's rules. *See* Individual Motion Practices of Hon. Sandra L. Townes, ¶ III.B. Accordingly, this Court will treat Seiden's first motion as a motion to dismiss pursuant to Rule 12(b)(6).

## A. Seiden's Motion to Dismiss

The standard relating to Rule 12(b)(6) motions and the law relating to § 1983 claims has already been discussed in connection with the County Defendants' motion. However, it bears repeating that in a §1983 action, a plaintiff must allege and prove two essential elements: (1) that "the conduct complained of must have been committed by a person acting under color of state law," and (2) that "the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell*, 13 F.3d at 547. Seiden argues that plaintiff cannot make out either element, asserting that the complaint fails to allege that Seiden, a private citizen, conspired with State officials to violate plaintiff's Constitutional rights and that "the complaint fails to allege any facts supporting a claim that [plaintiff's] rights were violated." Memorandum of Law in Support of First Motion ("Seiden Memo") at 8. In addition, Seiden argues plaintiff's fifth cause of action should be dismissed because the complaint does not allege facts establishing that Seiden had an attorney-

client relationship with plaintiff.

Seiden's first argument is predicated on the fact that the "under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). Nonetheless, private actors may be liable under § 1983 "if they have conspired with or engaged in joint activity with state actors." *Caporicci v. Nassau County Police Dep't*, No. CV 05-5764, 2007 WL 764535, at *8 (E.D.N.Y. Mar. 6, 2007) (citing cases). The purpose of the conspiracy or concerted action must be to deprive the plaintiff of constitutional rights. To prove a § 1983 conspiracy, "a plaintiff must show: (1) an agreement . . . between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d. Cir. 1999).

As plaintiff correctly notes, there is no heightened pleading requirement with respect to allegations of conspiracy. Plaintiff need only comply with the "notice pleading" requirements of Rule 8(a). *See Rivoli v. Gannett Co.*, 327 F. Supp. 2d 233, 239 (W.D.N.Y. 2004) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993). However, "the facts that are pleaded must provide a basis for a reasonable inference of state action, for the Court is not obligated to draw unreasonable inferences in plaintiff's favor, or to accept plaintiff's conclusions of law." *Id.* The complaint must contain more than conclusory allegations of conspiracy; "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed. *Dwares*, 985 F.2d at 100. A plaintiff need not and should not "plead mere evidence," but "should make an effort to provide some 'details of time and place and the alleged effect of the conspiracy.'"

*Id.* (quoting 2A *Moore's Federal Practice* ¶ 8.17[6], at 8-109 to 8-110 (2d ed. 1992)).

In this case, the complaint adequately alleges that Seiden engaged in joint activity with state actors. Although the allegation that Seiden "was a willing participant in joint action with the police," Am. Compl. at ¶ 37, might alone be inadequate, other allegations provide details concerning the time, place and alleged effects of the joint action. For example, plaintiff states that after plaintiff's telephone lines were cut, the police allowed him to speak to Seiden. Am. Compl. at ¶¶ 33-34. The Amended Complaint alleges that Seiden "professed to be acting on Plaintiff's behalf," *id.* at ¶ 35, but repeatedly advised plaintiff that police would storm his house and endanger his family unless he surrendered to the police. *Id.* at ¶ 40. From these facts, one could reasonably infer that Seiden was engaged in a joint effort to compel plaintiff to leave his home and surrender to authorities.

Seiden's second argument – that plaintiff has failed to allege a constitutional violation – is also without merit. As discussed in some detail in section I.A.1, *ante,* at pp. 12-16, plaintiff's Amended Complaint adequately alleges at least two constitutional violations: the warrantless, nonconsensual search of plaintiff's home and a *Payton* argument concerning the circumstances surrounding his arrest. The Amended Complaint implies that the joint activity in which Seiden engaged was undertaken with the purpose of facilitating plaintiff's warrantless arrest.[3] Accordingly, Seiden's motion to dismiss the § 1983 claims against him on the ground that plaintiff's pleading has not alleged a violation of federal Constitutional or statutory rights is also

_____

[3]There is a substantial question, however, as to whether the purpose of the joint activity was to facilitate the search of plaintiff's home. While the Amended Complaint alleges that Seiden falsely stated that he "would see to it that no illegal searches or seizures occurred," Am. Compl. at ¶ 42, this representation was ostensibly made for the purpose of encouraging plaintiff to leave his house and surrender. There are no allegations suggesting that Seiden acted with the purpose of facilitating the search of the home.

denied.

In his third argument, Seiden seeks to dismiss the fifth cause of action on the ground that he never entered into an attorney-client relationship with plaintiff and, therefore, has no fiduciary liability to plaintiff. In support of that argument, Seiden cites to *Catizone v. Wolff*, 71 F. Supp. 2d 365, 368 (S.D.N.Y. 1999), for the broad proposition that rules governing contract formation determine whether such a relationship has been created. *See* Seiden Memo at 11. Seiden then analyzes a non-exhaustive list of factors which courts have considered in determining the existence of an attorney-client relationship, stating that he intended only to assist "the police hostage team," and that nothing in the telephone conversations between plaintiff and Seiden justified a reasonable belief that an attorney-client relationship existed between the parties. *See* Seiden Memo at 12-14.

In New York, "an attorney-client relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services." *Catizone*, 71 F. Supp. 2d at 368 (quoting *Priest v. Hennessey*, 51 N.Y.2d 62, 68-69 (1980)). "Formality is not, however, 'an essential element in the employment of an attorney.'" *Knigge ex rel. Corvese v. Corvese*, No. 01 Civ. 5743 (DLC), 2001 WL 830669, at * 3 (S.D.N.Y. July 23, 2001) (quoting *Catizone*, 71 F. Supp. 2d at 368). Indeed, "since the initial arrangements for representation are often informal, it is necessary to look at the words and conduct of the parties" in determining whether an attorney-client relationship exists. *Catizone*, 71 F. Supp. 2d at 368.

In arguing that the fifth cause of action should be dismissed, Seiden does not even address the sufficiency of the Amended Complaint. That pleading alleges that, during his telephone conversations with plaintiff, Seiden "professed to be acting on Plaintiff's behalf as plaintiff's attorney," and that plaintiff acknowledged that Seiden was representing him as an

attorney. Am. Compl. at ¶¶ 35-36. The Amended Complaint further implies that Seiden advised plaintiff to surrender, and "confirm[ed]" that he "would see to it that no illegal searches or seizures occurred." *Id.* at ¶¶ 40, 42. These factual allegations are sufficient to support a claim predicated on the existence of an attorney-client relationship between plaintiff and Seiden.

In arguing that plaintiff cannot state a claim for breach of fiduciary duty, Seiden principally relies on information beyond the four corners of the pleading. In order to consider such information, this Court would have to convert Seiden's motion to one for summary judgment. *See* Fed. R. Civ. P. 12(b). As previously noted, this Court declines to do so. Seiden may, however, request permission to raise this same argument in a motion for summary judgment.

## B. Seiden's Motion for Sanctions

Neither Judge Wexler's Rules nor this Court's own Individual Motion Practices require that a defendant seek permission before bringing a motion for sanctions pursuant to Fed. R. Civ. P. 11(c). That subsection provides that this Court can impose sanctions if it determines that any of the provisions of Rule 11(b) have been violated. Rule 11(b) requires that, before signing or filing a pleading, an attorney must conduct "an inquiry reasonable under the circumstances" and determine, *inter alia*, that "the claims . . . therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law" and that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(2) and (3).

At this juncture, it is impossible for this Court to determine whether plaintiff's counsel has violated any of the provisions of Rule 11(b). As discussed above, plaintiff's Amended

Complaint states a claim on which relief can be granted against Seiden. Seiden's Rule 11 motion principally relies on facts outside of the Amended Complaint which remain in dispute and will doubtless be the subject of extensive discovery. While it is entirely possible that such discovery will unearth evidence of Rule 11(b) violations, such violations are not apparent at this time. Accordingly, Seiden's Rule 11 motion is denied without prejudice.

### III. The State Defendants' Motion

Unlike the other defendants, the State Defendants – Johnson and Peters – had not yet filed an answer at the time they filed their dispositive motion. Accordingly, they moved to dismiss the sole cause of action against them pursuant to Fed. R. Civ. P. 12(b)(6).[4] The legal standard relating to Rule 12(b)(6) motions has already been discussed in connection with the County Defendants' motion. *See* pp. 9-11, *ante*.

In moving to dismiss the sole cause of action against them, the State Defendants advance four arguments. First, they argue that plaintiff is collaterally estopped from arguing that the State Defendants violated plaintiff's rights to procedural due process because plaintiff refused to take part in the "fair hearing" belatedly offered by OCFS. Second, the State Defendants argue that plaintiff is not entitled to procedural due process because he lacks a protectable liberty interest. Third, these defendants argue that they did not violate plaintiff's right to procedural due process because, in conducting an administrative review, they did not apply the "some credible evidence" standard which was found unconstitutional in *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1981). Fourth, the State Defendants contend that plaintiff's § 1983 claims should be dismissed for lack of subject matter jurisdiction because such claims could have been meaningfully

---

[4]For reasons which are unclear, the State Defendants' motion attaches a Rule 56.1 Statement. As plaintiff correctly notes, *see* Reply Memo at 15, this submission is unnecessary because these defendants are not moving for summary judgment.

addressed in proceeding pursuant to Article 78 of New York's Civil Practice Law and Rules.

## A. Collateral Estoppel

Collateral estoppel – also known as "issue preclusion" – promotes judicial economy by preventing the relitigation of identical issues. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 731 (2d Cir. 1998), *cert. denied*, 526 U.S. 1146 (1999) (citing *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir.1998)). This doctrine "bars a party from raising a specific factual or legal issue in a second action when the party had a full and fair opportunity to litigate the issue in a prior proceeding." *Id.* "[A]n administrative determination may be given collateral estoppel effect in a subsequent civil action '[w]hen an administrative agency [acted] in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.'" *Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 132 (2d Cir. 2007) (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 392, 422 (1966)) (brackets in *Chauffeur's Training Sch.*).

Applying common-law rules of issue preclusion, the Supreme Court has held that federal courts must give a State agency's factfinding the same preclusive effect to which it would be entitled in the State's courts. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986); *Farrell v. Burke*, 449 F.3d 470, 482 (2d Cir. 2006). New York State courts "give conclusive effect to an administrative agency's quasi-judicial determination when two basic conditions are met: (1) the issue sought to be precluded is identical to a material issue necessarily decided by the administrative agency in a prior proceeding; and (2) there was a full a fair opportunity to contest this issue in the administrative tribunal." *Jeffreys v. Griffin*, 1 N.Y.3d 34, 39, 769 N.Y.S.2d 184, 187 (2003); *see also Locurto v. Giuliani*, 447 F.3d 159, 169-70 (2d Cir. 2006). The proponent of

collateral estoppel has the burden of proof with respect to the first element, while the opponent has the burden of proof with respect to the second. *Jeffreys*, 1 N.Y.3d at 39, 769 N.Y.S.2d at 187.

In this case, the State Defendants cannot meet their burden because no decision has yet been rendered by an administrative tribunal. As plaintiff's pleadings allege, and as the State Defendants concede, Peters wrote plaintiff a letter dated September 5, 2001, in which he implied that a "fair hearing" would be held if plaintiff's request for amendment of the Register was either denied or if the amendment was not made within 90 days. However, that hearing was not held at any point during the almost-two-year period between that writing of that letter and the commencement of this action.

The State Defendants have introduced evidence indicating that in January 2004 – more than four months following the commencement of this action – OCFS finally scheduled a "fair hearing." Even assuming that this Court were to take this evidence into consideration upon this Rule 12(b)(b) motion, and that this evidence were sufficient to establish that plaintiff was afforded a "full and fair opportunity" to litigate the issue of whether his name should remain on the Register, this showing still would not suffice to satisfy the State Defendants' burden. The State Defendants concede that the "fair hearing" was never held because plaintiff wanted to proceed with this litigation and refused to cooperate. *See* State's Memorandum of Law in Support of Motion to Dismiss at 5. Accordingly, there were never any administrative determinations which could serve as a basis for collateral estoppel.

**B. Protectable Liberty Interest**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . .

deprive any person of life, liberty, or property, without due process of law." As the Supreme Court noted in *Daniels v. Williams*, 474 U.S. 327 (1986), "this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Id.* at 331 (emphasis in original). "[N]egligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

The Due Process Clause protects individuals against two types of government action. Substantive due process "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal quotations and citations omitted). Procedural due process requires that government action depriving an individual of substantial interests in life, liberty or property "be implemented in a fair manner." *Id.* There are three elements to a procedural due process claim: "(1) that the plaintiff possessed a constitutionally protected interest, (2) that such interest was deprived as a result of government action, (3) and that the deprivation occurred without constitutionally adequate pre- or post-deprivation process." *Does v. Mills*, No. 04 Civ. 2919 (RWS), 2005 WL 900620, at *8 (S.D.N.Y. April 18, 2005) (citing *New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir. 2001)).

In this case, the State Defendants argue that the allegations in plaintiff's complaint fail to make out the first element of a procedural due process claim: a violation of a constitutionally protected interest. The State Defendants infer, based on plaintiff's conclusory assertion that he has "a protectable liberty interest in his name not being on 'The Register,'" Am. Compl. at 90, that plaintiff is raising a stigma-plus liberty interest claim. In order to state this sort of a claim, a

plaintiff must allege (1) the utterance of a defamatory, stigmatizing statement, and (2) "some tangible and material state-imposed burden . . . ." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds*, *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003)).  The State Defendants' argument implies that plaintiff has not alleged facts making out the second element.

The State Defendants' argument focuses primarily on *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), in which the Second Circuit addressed the question of whether a plaintiff's liberty interests were violated when the defendants placed her name on the Register.  The plaintiff in that case alleged that she had been a "paraprofessional in the school system" in the past and "would look for a position in the child care field but for her presence on the . . . Register." *Id.* at 999.  The Second Circuit held that these allegations were sufficient to meet the "stigma-plus" test.  The Court noted that New York State Social Services Law ("SSL") § 424-a requires "[n]umerous state agencies, private businesses, and licensing agencies related to child care, adoption, and foster care . . . to inquire whether potential employees or applicants are on the . . . Register," *id.* at 995 (citing SSL § 424-a(1)), and provides that a person listed on the Register can only be hired if the employer maintains a written record, as part of the application file or employment record, of the specific reasons why "such person was determined to be appropriate" for employment. *Id.* (quoting SSL § 424-a(2)(a)).  The Court reasoned that inclusion in the Register would give rise to a "statutory impediment established by the state" to the plaintiff's opportunity to seek employment, thereby placing "a tangible burden on her employment prospects." *Id.* at 1001.

The State Defendants argue that because plaintiff is a lawyer, not a child care worker, his

employment prospects were unaffected by his listing on the Register.  These defendants reason

that because plaintiff's case is distinguishable from that of *Valmonte*, he cannot state a stigma-

plus liberty interest claim.  In response, plaintiff does not contend that his presence on the

Register burdens his practice of law, but argues that he can nonetheless "show 'stigma plus'"

because his wife and he "cannot now adopt a child since his name is on the Register."  Opp.

Memo at 15-16.

Plaintiff's argument is not fully explained in his memorandum of law, but appears to be

based on the reasoning in *Valmonte*.  As the Second Circuit noted in that case, New York State

law requires "[n]umerous state agencies, private businesses, and licensing agencies related to . . .

adoption . . . to inquire whether potential employees or applicants are on the . . . Register." *Id.* at

995 (citing SSL § 424-a(1)).  Adoption agencies, like employers, are not forbidden to deal with

persons who are listed on the Register, but must justify their reason for doing so in writing.

Specifically, SSL 424-a(2)(a) provides that if a person who is the subject of an indicated report is

approved to adopt children, the adoption agency must "maintain a written record, as part of the

application file . . . , of the specific reasons why such person was determined to be appropriate to

receive [an] adoption placement."  Plaintiff implies that, in light of this statutory provision, his

presence on the Register will all but doom his attempts to adopt, and will, therefore, burden his

ability to adopt children.

The facts on which this argument are based, however, are nowhere mentioned in

plaintiff's pleadings.  Indeed, in discussing the facts on which this arguments is based, plaintiff

cites only to the declaration of his wife, which was filed as part of plaintiff's responsive papers.

*See* Opp. Memo at 15-16.  That declaration reveals, for the first time, that plaintiff and his wife

are "an infertile couple," who conceived their existing children through resource to in vitro fertilization techniques which are too costly to repeat and unlikely to succeed. *See* Declaration of Debra R. Comer, dated November 15, 2004, at ¶ 10. Ms. Comer does not allege that she and plaintiff have ever attempted to adopt a child, but states, "I believe that we are wrongly being deprived of our right to expand our family through adoption by virtue of my husband's name having been added to the . . . Register." *Id.*

Although his pleadings do not even hint at the facts central to his stigma-plus liberty interest claim, plaintiff asserts that he has nonetheless complied with the notice pleading requirements of Fed. R. Civ. P. 8(a). *See* Opp. Memo at 16 (citing *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)). This Court cannot agree. Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has interpreted that provision as requiring that a complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Erickson*, 127 S.Ct. at 2200; *Swierkiewicz*, 534 U.S. at 512. As previously noted, "a plaintiff's obligation to provide the 'grounds' . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964-65 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

In this case, plaintiff has not adequately alleged the grounds for his stigma-plus liberty interest claim. Indeed, the Amended Complaint only hints that plaintiff is advancing such a claim by (1) conclusorily alleging that plaintiff "has a protectable liberty interest in his name not being on 'The Register,'" Am. Compl. at ¶ 89, and (2) baldly asserting that the State Defendants have violated his rights under the Fourteenth Amendment. *Id.* at ¶ 87. Plaintiff's pleading does not contain any factual allegations whatsoever which would suggest that plaintiff has a plausible

basis for a procedural due process claim.

To be sure, plaintiff's opposition papers contain new factual allegations which might arguably support a stigma-plus claim. However, in light of the Supreme Court's recent decision in *Twombly*, this Court is constrained to reject any suggestion that the wholly conclusory allegations in the Amended Complaint are sufficient simply because plaintiff might be able to prove facts – undisclosed in his pleadings – which might state a stigma-plus liberty interest claim. In disavowing the oft-quoted statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the *Twombly* Court noted that such a rule could "be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings." *Id.* at 1968. Plaintiff, who is essentially arguing that the Amended Complaint is sufficient because the allegations therein reveal the theory of the claim, is tacitly requesting this Court to adopt the broad reading of the notice pleading standard which was expressly rejected in *Twombly*. This Court cannot do so and, accordingly, that portion of plaintiff's procedural due process claim which is based on a deprivation of plaintiff's liberty interests is dismissed.

### C. The Administrative Standard and the Failure to Bring an Article 78 Proceeding

The State Defendants' final two arguments both deal with the third element of a procedural due process claim: whether the deprivation of a property or liberty interest "occurred without constitutionally adequate pre- or post-deprivation process." *Does*, 2005 WL 900620, at *8. The third argument addresses the question of whether the State Defendants applied the "some credible evidence" standard which was held to violate due process in *Valmonte*. The

fourth argument implies that plaintiff's claim relates to "random, unauthorized acts by state employees," and did not violate procedural due process because the State provides a meaningful post-deprivation remedy in the form of an Article 78 proceeding. *See Hellenic Am. Neighborhood Action Comm.*, 101 F.3d 877, 880 (2d Cir. 1996).

Since this Court has already determined that plaintiff has not adequately pled the first element of a procedural due process claim, it is unnecessary to determine whether plaintiff received constitutionally adequate due process prior to or following the deprivation of that interest. However, if this Court were to address these arguments, it would determine that the facts alleged by plaintiff do not make out this third element of a due process claim. First, plaintiff is incorrect in asserting that the Second Circuit "held unconstitutional the NYS statutory scheme whereby persons are listed on the register." Am. Compl. at ¶ 90. In *Valmonte*, the Second Circuit narrowly held that use of the "some credible evidence" standard in making the initial determination of whether to include someone on the register created an unacceptably high risk of error. *Valmonte*, 18 F.3d at 1003-04. The Amended Complaint does not specifically allege that the State Defendants used this standard in deciding to include plaintiff on the Register. Indeed, in light of the letter from defendant Peters to plaintiff, dated October 2, 2002, which indicates that a "fair preponderance of the evidence" standard was used in plaintiff's case, plaintiff would appear to lack a good-faith basis for asserting that these defendants applied the constitutionally inadequate "some credible evidence" standard.

Second, the State Defendants' argument that plaintiff had a meaningful postdeprivation remedy has merit. The only factual allegations relating to defendant Peters relate to his failure to timely schedule a "fair hearing" with respect to plaintiff's request that the "Indicated" finding be

changed and that his name be expunged from the Register. See Am. Compl. at ¶¶ 59-60.[5] Even

assuming Peters acted intentionally, rather than negligently, his act was random and

unauthorized and taken in disregard of established state procedures. This Court agrees with

defendants that Article 78, which authorizes proceedings in the nature of mandamus, could have

provided plaintiff with a meaningful postdeprivation remedy for Peters' actions.

### *CONCLUSION*

For the reasons stated above, those portions of the County Defendants' motion which

seek (1) to dismiss all claims against defendants County of Nassau and the Police Department of

the County of Nassau and (2) to dismiss all pendent State claims against the County Defendants

are granted. Accordingly, defendants County of Nassau and the Police Department of the

County of Nassau are hereby dismissed from this action. Those State claims which are brought

against the remaining defendants and raised in the Amended Complaint's third cause of action

are also dismissed. The County Defendants' motion is denied in all other respects.

Defendant Seiden's motions are denied in all respects. Assuming that Seiden wishes to

move pursuant to Fed. R. Civ. P. 15(a) to amend his answer, he shall file a pre-motion

conference request in accordance with ¶ III.B of this Court's Individual Motion Practices on or

before October 15, 2007. Plaintiff shall file his response thereto on or before October 22, 2007.

Seiden may renew his motion for Rule 11 sanctions following the final disposition of plaintiff's

claims against Seiden, provided that such claims are ultimately dismissed and that Seiden has a

legal basis for such a motion.

---

[5]The Amended Complaint contains no allegations concerning the involvement of
defendant John A. Johnson.

The State Defendants' motion is granted. Although the fourth cause of action in the Amended Complaint alleges that these defendants have violated plaintiff's rights under the First, Second, Sixth and Eighth Amendments of the United States Constitution, *see* Am. Compl. at ¶ 87, the facts alleged in plaintiff's pleadings do not suggest any Constitutional violation other than the alleged procedural due process violation discussed above. Accordingly, the fourth cause of action in the Amended Complaint is dismissed and defendants Peters and Johnson are dismissed from this action.

This Court will hold a conference in this case on October 24, 2007, at 10:00 a.m. to discuss Seiden's request to file a Rule 15(a) motion, if any, and to clarify which issues remain in the case for discovery. Magistrate Judge Michael Orenstein is requested to enter an order vacating the stay of discovery, setting a discovery schedule in this case, and setting a deadline for the filing of the parties' requests to file motions for summary judgment.[6]

**SO ORDERED.**


_____S/_____
SANDRA L. TOWNES
United States District Judge


Dated: Brooklyn, New York
September 24, 2007

_____

[6]When the parties seek permission to move for summary judgment, Seiden may seek to move for summary judgment on the Amended Complaint's fifth cause of action on the ground that he never entered into an attorney-client relationship with plaintiff.