UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JAMES M. MALONEY,

                Plaintiff,

      - against -
                                    CV 03-4178 (SLT) (MLO)

THE COUNTY OF NASSAU, THE POLICE
DEPARTMENT OF THE COUNTY OF NASSAU,
DENIS DILLON, in his official capacity as District
Attorney of the County of Nassau, JOAN P. YALE,
ROBERT SEIDEN, ESQ., JOHN A  JOHNSON, in his
official capacity as Commissioner of the State of New
York Office of Children and Family Services, DAVID
R. PETERS, in his official capacity as Director of the
State Central Register of the State of the New York
Office of Children and Family Services, and JOHN
DOES No. 1 through 100,

                Defendants.

-------------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Victor M. Serby, Esq.
*Attorney for Plaintiff*
255 Hewlett Neck Road
Woodmere, NY 11598

(516) 374-2455

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Standards for Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I:     SEIDEN ENGAGED IN CONCERTED ACTION WITH
STATE ACTORS TO DEPRIVE PLAINTIFF OF HIS
RIGHTS UNDER *PAYTON v. NEW YORK* . . . . . . . . . . . . . . 3

*Element # 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Element # 2* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Element # 3* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT II:    SEIDEN BREACHED HIS FIDUCIARY AND LEGAL
OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>TABLE OF AUTHORITIES</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . 1

*Catizone v. Wolff*, 71 F. Supp. 2d 365 (S.D.N.Y.1999) . . . . . . . . . . . . . . . . . . . . 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Greene v. Greene*
47 N.Y.2d 447, 391 N.E.2d 1355, 418 N.Y.S.2d 379 (1979) . . . . . . . . . . . . . . . 23

*Johnson v. Constantellis*, 2005 WL 2291195 (S.D.N.Y. Aug. 10, 2005) . . . . . . . 8

*Kirk v. Louisiana*, 536 U.S. 635 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Knigge ex rel. Corvese v. Corvese*
2001 WL 830669 (S.D.N.Y. July 23, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lyman v. City of Albany*, 536 F. Supp. 2d 242 (N.D.N.Y. 2008) . . . . . . . . . . . . . 3

*Maloney v. County of Nassau*, 623 F. Supp. 2d 277 (E.D.N.Y. 2007) . . . . . . 3, 21

*Niagara Mohawk Power Corp. v. Jones Chemical Inc.*
315 F.3d 171 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . 3

*Payton v. New York*, 445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Peres v. Oceanside Union Free Sch. Dist.*
426 F. Supp. 2d 15 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Priest v. Hennessy*
51 N.Y.2d 62, 431 N.Y.S.2d 511, 409 N.E.2d 983 (1980) . . . . . . . . . . . . . . . . . 20

*Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 2

PRELIMINARY STATEMENT

This memorandum of law is submitted in support of Plaintiff JAMES M. MALONEY's motion for partial summary judgment on the issue of the liability of Defendant ROBERT SEIDEN, ESQ. (hereinafter, "Seiden").

STATEMENT OF FACTS

The basic factual background in this long-litigated matter is well familiar to the Court, and was set forth most recently in the Memorandum and Order of Sept. 24, 2007 (Item # 99), which is reported at 623 F. Supp. 2d 277.

Undisputed material facts germane to this motion are set forth in the accompanying Rule 56.1 statement.

ARGUMENT

*Standards for Summary Judgment*

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 256 (1986); *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. *See Anderson*, 477 U.S. 242, 255; *Vann v. City of New York*, 72 F.3d 1040, 1048-49 (2d Cir. 1995).

Here, the deposition testimony of Seiden and of Defendant JOAN P. YALE, the admissions of the County defendants, the transcripts of the recorded conversations between Maloney and Seiden on the night of the incident, and, perhaps most importantly, Seiden's own affidavit, conclusively establish beyond any dispute that Seiden engaged in concerted action with state actors to deprive plaintiff of his rights under *Payton v. New York* and its progeny, thereby establishing Seiden's liability as a matter of law.  (The quantum of damages to Plaintiff arising out of Seiden's conduct should be determined at an inquest.)

POINT I

SEIDEN ENGAGED IN CONCERTED ACTION WITH STATE ACTORS TO
DEPRIVE PLAINTIFF OF HIS RIGHTS UNDER *PAYTON v. NEW YORK*

As this Court has previously noted, "private actors may be liable under §
1983 if they have conspired with or engaged in joint activity with state actors. . . .
The purpose of the conspiracy or concerted action must be to deprive the plaintiff
of constitutional rights."  *Maloney v. County of Nassau*, 623 F. Supp.2d 277, 293
(E.D.N.Y. 2007) (internal citation omitted).  To prove a § 1983 conspiracy,  "a
plaintiff must show: (**1**) an agreement ... between a state actor and a private entity;
(**2**) to act in concert to inflict an unconstitutional injury; and (**3**) an overt act done
in furtherance of that goal causing damages." *Id*. (citing *Pangburn v. Culbertson*,
200 F.3d 65, 72 (2d Cir.1999)).  See also *Lyman v. City of Albany*, 536 F.Supp.2d
242, 248 (N.D.N.Y. 2008) (setting forth substantially identical enumerated three-
element test, citing *Peres v. Oceanside Union Free Sch. Dist*., 426 F. Supp. 2d 15,
24 (E.D.N.Y. 2006)).  Each of those three elements will next be discussed in the
context of the facts here.

*Element # 1*

Seiden himself has conclusively established Element #1, i.e., an agreement between the state actors (here, the Nassau County Police) and the private entity (here, Seiden).  In his Affidavit (sworn to February 11, 2004), Seiden declared under oath that on the night of the incident that:

> [U]pon instructions from the Nassau County Police Hostage negotiating team, I participated in conversations [with Plaintiff] in their full continuous presence.  I followed directions of the Nassau County Police to coach the Plaintiff to surrender . . . . I was told to completely comply with their instructions including what to say and what not to say. . . . I acted purely as a concerned citizen and *civilian member of the hostage negotiation team*.

Affidavit of Robert W. Seiden (sworn to February 11, 2004) (introduced as Exhibit 2 at deposition of Robert W. Seiden, June 20, 2008) (true copy of exhibit submitted herewith as Exhibit 2 to the Declaration of Victor M. Serby), at page 4 (emphasis added).

It is submitted that Seiden's self-described status as a "civilian member of the hostage negotiation team" establishes beyond any question that he was acting in concert with the police.  As will be seen *infra*, that proposition is corroborated by the County Defendant's admissions.

*Element #2*

It is also beyond dispute that the police and Seiden acted in concert with the Nassau County Police to coerce Maloney into exiting his home without any warrant ever having been obtained for his arrest. In their Rule 36 responses (true copy submitted herewith as Exhibit 4 to the Declaration of Victor M. Serby), the County Defendants specifically admit that Defendant JOAN P. YALE ("Yale") and Seiden acted jointly[1] to convince Maloney to leave his home and surrender to police without an arrest warrant (Response to #26). They also admit that police never obtained a warrant (Response to #18), and deny that they ever even made an application for one during the 12 hours that they surrounded Plaintiff's home (Response to #19). These latter admissions are corroborated by the deposition testimony of Yale, who also admitted that Plaintiff had repeatedly requested that a warrant be obtained and that the only basis for claiming "exigent circumstances" was an alleged, uncorroborated threat to a Verizon worker made many hours before:

---

[1] The County Defendants also admit that Yale was the highest-ranking Nassau County Police Department member on the scene and was in charge of the "hostage negotiation team." Response to ## 28, 30. This was, of course, the same "hostage negotiation team" that Seiden admitted to being a member of in his Affidavit. As is clear from numerous documents in the record, there were never any "hostages", and indeed Maloney was never charged with committing any act such as holding anyone against their will or threatening the police or anyone in his home.

Q      Did Mr. Maloney ever communicate to you that he would voluntarily come out of his house if he produced an arrest warrant?

A      . . . I do remember, upon listening to the tapes, though, that he makes reference that they can't come and get him because they don't have an arrest warrant and they should do it, the police should go get an arrest warrant.

Q      Did the police, to your knowledge, make any attempt to get an arrest warrant that evening?

A      No.  There was no need to.

Q      Why was there no need to, in your opinion?

A      Because we had exigent circumstances to enter that house, if we needed.

Q      Is it true that the sole, your sole knowledge of the exigent, what constituted the exigent circumstances was a say-so of a civilian Verizon worker?

A      A sworn deposition by a confirmed Verizon worker.

Yale Dep. at 114-15 (true condensed copy submitted herewith as Exhibit 5 to the

Declaration of Victor M. Serby).

Arguably, the "sworn deposition" of the "confirmed" Verizon worker would

have constituted probable cause in seeking a *warrant* for Maloney's arrest, but it

did not give rise to exigent circumstances.  The Verizon worker had left the scene

hours ago, and the record is clear that no one observed Maloney threatening

anyone and that no one was actually held hostage.  Indeed, the Nassau County

Police Department's own report, which was Exhibit 1 to the Yale Deposition,

notes at page C5 (item 53) that Maloney's wife "was free to leave" the home at

any time.  See Exh. 1 to Yale Dep. (true copy submitted herewith as Exhibit 6 to

the Declaration of Victor M. Serby).  Moreover, Maloney was never charged with

any crimes relating to threatening police or holding anyone against their will, and

it was not even the police who reported the incident to Child Protective Services

although they had a duty to do so if they believed Maloney had done any such

thing.[2]  In sum, there were no exigent circumstances, and police would have

needed a warrant to enter the home to arrest Maloney under *Payton v. New York*,

445 U.S. 573, 576 (1980).  As a 2005 Southern District of New York opinion

explained succinctly, citing *Payton*:

> [E]ven if probable cause exists, a police officer may not enter the
> home of a criminal suspect to effect a warrantless arrest unless the

---

[2] As became clear when documents were first produced in anticipation of Maloney's fair hearing in 2008, and as was confirmed at a non-party deposition, the Rabbi whom Seiden had summoned to the scene decided to report Maloney to Child Protective Services after learning that the police had not done so.  See paragraphs 13-17 of the Declaration of Victor M. Serby submitted herewith; Exhibits 11-13 thereto.  Under the applicable provisions of section 413 of the New York Social Services Law, *q.v.*, if the police or any other law enforcement official had had cause to believe that Maloney had committed any act of child abuse or maltreatment, including holding his own family members hostage, they would have had a legal obligation to make a report of suspected child abuse or maltreatment to the New York State Office of Children and Family Services and/or the Nassau County Department of Social Services.  But they did not.  It is inconceivable that police would have had the authority to enter the home under the "exigent circumstances" doctrine but *not* have had a corresponding duty to report the incident that gave rise to such "exigent circumstances" to the appropriate authorities under § 413.

-7-

> officer has been given consent or there are exigent circumstances. *See Payton v. New York*, 445 U.S. 573, 576 (1980) ("the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest") (citations omitted); *accord, Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam).  Obviously, if a warrant is ordinarily needed to effect a felony arrest inside a suspect's home, the same rule should apply with even greater force when the alleged crime is a misdemeanor. *See Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) ("application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense ... has been committed") . . . .

*Johnson v. Constantellis*, 2005 WL 2291195 (S.D.N.Y. Aug. 10, 2005), at *8.  *See also U.S. v. Lavan*, 10 F. Supp. 2d 377, 383-84 (S.D.N.Y. 1998) (in a case involving a six-hour "standoff" following which police forcibly entered a suspect's home, and in the absence of clear evidence of exigent circumstances, court was bound to conclude that authorities "could have made a telephonic application," and noting "the presumptive unconstitutionality of warrantless entries of private homes").

In sum, there is no genuine dispute that Seiden and the police sought for many hours to convince or coerce Maloney into forgoing his *Payton* rights and leaving his home without a warrant.  The only question remaining is whether Seiden engaged in "an overt act done in furtherance of that goal causing damages" (Element #3, page 3, *supra*).

-8-

*Element #3*

The recordings and transcripts of the conversations between Seiden and
Maloney unerringly reveal that Seiden was deceiving Maloney the entire time,
pretending to act as his counsel, advising him as to the law and criminal defense
strategy, and making promises that he (Seiden) did not intend to keep, all of which
led to Maloney's eventually acquiescing into leaving his home even though the
warrant he had repeatedly demanded had never been produced after some twelve
hours of siege.

Pages 38-39 of a condensed transcript supplied by Mr. Seiden's previous
attorney, which comprised two of the four condensed pages found on Exhibit 6 to
the continued deposition of Seiden of September 25, 2008 (true copy of initial and
continued deposition transcripts submitted herewith as Exhibit 8 to the Declaration
of Victor M. Serby, and pages 38-39 of the condensed transcript at Exhibit 10 to
the Declaration of Victor M. Serby), document the following exchange between
Maloney and Seiden:

> MR. MALONEY:  I'm safely here with my family, and I want
> to be left alone. I have a right to that; that's our constitutional right.

> MR. SEIDEN: But at some point you're going to have to get
> out of there.

> MR. MALONEY: Huh?

MR. SEIDEN: At some point, you're going to have to get out of there.

MR. MALONEY: Why do -- why do the police have a right to remove me from my home?

MR. SEIDEN: *It's the law*, I mean, you know, the arrest warrant; nothing *we* can do about that. And if they -- you know, if they do get a warrant, it will indicate to them that you're uncooperative and a judge will be harder on you. I mean, I was thinking about that as well. You know, it just hurts *our arguments* before the judge. The judge will -- I say, Judge -- you know, if you come out and the judge sees you cooperated, you come out, you've got nothing to hide, you didn't do anything wrong, this guy's making up some baloney story about you threatening him, you know, that's fine. You got a good case. You know, you have clean hands. But the longer you stay in there, then the judge is thinking this guy must have did something wrong, otherwise why is he not coming out?

Exhibit 6 to Seiden Dep. (true copy submitted herewith as Exhibit 10 to the

Declaration of Victor M. Serby) at 38-39 (emphasis added).

Notably, Seiden advised Maloney that his (Maloney's) staying in the house

and continuing to demand a warrant "hurts *our* arguments before the judge,"

clearly implying (both by giving legal advice and by using the first person plural

in that context) that he was acting as Maloney's counsel. Elsewhere on the same

exhibit, *q.v.*, Seiden promises Maloney that he (Seiden) will be there when

Maloney comes out, stating: "I will be with you. . . . You'll see my face and then

*we'll take care of this* and, you know, the judge will see that you cooperated . . ."

*Id.* at 40, lines 5, 9-11 (emphasis added). Of course, Seiden was long gone when

Maloney came out and never had any intention of being there or of being part of the "we" that would "take care" of anything on Maloney's behalf.

When asked about the above-quoted passage at his deposition, Seiden admitted that he never had any intention of representing Maloney:

> Q      When you stated, "You know, it just hurts our arguments before the judge," were you going to be representing him before the judge?

> A      Of course not. . . .

Seiden Dep. at 123, lines 11-14 (Exhibit 8 to the Declaration of Victor M. Serby).

At more than one point, Maloney indicated to Seiden that he (Maloney) thought Seiden was acting as his criminal defense attorney at the time, and Seiden did nothing to correct what he (Seiden) has subsequently revealed to be a very wrong impression.  For example, pages 79-81 of a condensed transcript supplied by Mr. Seiden's previous attorney, which comprised Exhibit 4 to the continued deposition of Seiden on September 25, 2008, document the following exchange between Maloney and Seiden in which Maloney wanted Seiden to be allowed into the home to speak with him:

> MR. MALONEY:  . . . I'd like you in here to discuss evidence and chain of evidence because that could be fixed up wrong, okay?

> MR. SEIDEN: Well, you want to talk about it with me, you're saying?

> MR. MALONEY: Yeah, I'd like to -- I'd like to -- listen, *don't you*

-11-

*have a right to visit your client?*

> MR. SEIDEN: I don't but --

> MR. MALONEY: Don't you have a right to --

> MR. SEIDEN: -- under these circumstances, they're allowed to prevent, you know, that from happening because of the emergency situation.

> MR. MALONEY: But you realize the net effect of this, Rob, is that I'm -- I can be coerced from my home on a charge that has yet to be proven that was of no consequence and there was no actual harm to anyone.

> MR. SEIDEN: I agree with you but that's just it, I was just doing justice.

> MR, MALONEY: Well, I mean, you know, the thing is we have a right to liberty in our homes, and that's what I'm holding up against.

> MR. SEIDEN: Right, but the thing is this, if you don't come out, they can get an arrest warrant and come in and that's not what -- that's what I'm trying to prevent.

Exhibit 4 to Seiden Dep. (true copy submitted herewith as Exhibit 9 to the

Declaration of Victor M. Serby) at 79-81 (emphasis added where Maloney

characterizes himself as Seiden's client).

Farther down on page 81 of the same exhibit (starting at line 20), *q.v.*,

Seiden volunteers assurances that if Maloney comes out without requiring the

police to obtain a warrant, the police will not come into Maloney's house "looking

for your stuff or whatnot."  Of course, that promise, like all others he made, was

hollow.

The above are but the most salient and egregious excerpts from an extended dialogue between Maloney and Seiden in which Maloney continues to assert his right to remain in his home unless and until a warrant is obtained, and in which Seiden continues to pretend to act as Maloney's counsel, all the while lying, making false promises, and relaying messages from the police meant to coerce and cajole Maloney to stop demanding a warrant and leave his home.  It is respectfully submitted that the above suffices to establish that Seiden engaged in an overt act done in furtherance of the police's goal of causing Maloney to forgo his demand for an arrest warrant (Element #3, page 3, *supra*).  That Maloney suffered damages[3] as a direct result of Seiden's actions is axiomatic: at the very least, had Seiden informed Maloney that he (Seiden) was not acting or speaking on Maloney's behalf but rather as an agent of the police, Maloney would have sought other counsel.  This is borne out by indisputable facts that will be discussed in Point II, *infra*.

---

[3] The quantum of damages to Plaintiff arising out of Seiden's misconduct is beyond the scope of this motion and should be determined at an inquest if this motion is granted.

POINT II

SEIDEN BREACHED HIS FIDUCIARY AND LEGAL OBLIGATIONS

As a threshold matter, it is worth noting that it is indisputable that Maloney specifically asked the police to contact Seiden early on.  The following exchange, reflected in the transcript of the recordings of Maloney's conversations with the "hostage negotiation team" before Seiden arrived,  reflects Maloney's first request that Seiden be contacted:

DETECTIVE GILMA: Jim, it's very simple. Just come out and talk to us.

MR. MALONEY:  Just call -- get my attorney, okay? I have an attorney right here in town. You want his name?

DETECTIVE GILMA: But you don't -- why do you need an attorney?

MR. MALONEY: I don't know.

DETECTIVE GILMA: You didn't do anything.

MR. MALONEY: Because I'm under house arrest. Because you got me surrounded.

DETECTIVE GILMA: What's the attorney's name?

MR. MALONEY: Rob Seiden.

DETECTIVE GILMA: Seiden?

MR. MALONEY: S-E-I-D-E-N.

-14-

DETECTIVE GILMA: S-E-I-D-E-N?

MR. MALONEY: Yeah. If you send him over, I'll sort it out with him, all right? I'll give you his home number.

DETECTIVE GILMA: What's him home number?

MR. MALONEY: (516) --

DETECTIVE GILMA: Um-hum.

MR. MALONEY: -- 767-1996

DETECTIVE GILMA: 1996? What -- where is he? What town is he in?

MR. MALONEY: Right here.

DETECTIVE GILMA: In Port Washington?

MR. MALONEY: Yes.

DETECTIVE GILMA: Okay.

MR. MALONEY: Okay.

DETECTIVE GILMA: Do you know if he's home?

MR. MALONEY: I don't know. You can keep trying.

DETECTIVE GILMA: He's -- he's --

MR. MALONEY: But call him. Keep calling him instead of keep calling me because you're just messing up my day and I'm in a pretty good mood right now and nobody's in trouble here and we're just a family at home.

DETECTIVE GILMA: Is it Rob?

-15-

MR. MALONEY: If somebody told you I did something, they're wrong. I haven't done anything to hurt anybody and you know it.

DETECTIVE GILMA: I know that but we -- we still need to talk face-to-face.

MR. MALONEY: No, we don't.

DETECTIVE GILMA: What is his name, Rob or Ralph?

MR. MALONEY: If you want to talk, we talk like this. What do you think?  I'm going to come out so you can, you know, do something to me? Come on.

DETECTIVE GILMA: What are -- what are we going to do to you?

MR. MALONEY: I don't know.

DETECTIVE GILMA: Do you think -- I'm not going to do anything to you. No one's going to do anything to you.

MR. MALONEY: Well, look. Look. Look. Then get my attorney and get him over here, okay? Get me any of these attorneys, okay?

DETECTIVE GILMA: Well, will you come out if Rob's with you?

MR. MALONEY: No. I'll talk to Rob on the phone, and preferably not on a tapped line like this one, okay? Bye.

(Mr. Maloney disconnects).

(Detective Gilma disconnects).

Exh. 2 to Yale Dep. (true copy submitted herewith as Exhibit 7 to the Declaration of Victor M. Serby), at pages 1-5 (numbered in footer as 36-40 of 60).

The transcript continues with repeated calls from the detective to Maloney,

-16-

with the detective demanding that Maloney come out and Maloney asserting his

right to counsel because his freedom of movement is restricted and he considers

himself under house arrest:

> DETECTIVE GILMA: Well, we need to hear your side of what happened, but you have to come out and talk to me.

> MR. MALONEY: Nothing. I need to know -- I have a right as a -- I have a right -- I am under arrest because my freedom of movement is restricted.

> DETECTIVE GILMA: You're not under arrest.

> MR. MALONEY: Yes, I am. My freedom of movement is restricted.

> DETECTIVE GILMA: You can come out the front door.

> MR. MALONEY: Get my attorney.

*Id.* at page 9 (numbered in footer as 44 of 60).

The transcript continues with yet more calls from the detective to Maloney,

with the detective pointing out that Maloney will "eventually" have to leave his

home and asserting that the police "will not go away."  Maloney offered to give

the police the names of other attorneys, but the detective stated that they were

working on getting his "personal guy," i.e., Seiden.

> DETECTIVE GILMA: Well, you know you -- you know you're going to have to [come out] eventually. You can't stay there all day, all night, forever. And we're not going away, 'cause it --

> MR. MAHONEY [*sic*]: All right.

DETECTIVE GILMA: We need to resolve what happened this morning.

MR. MAHONEY [*sic*]: All right. I want to talk -- I got other attorneys I want to talk to.

DETECTIVE GILMA: Well, we're working on getting that one guy, your personal guy.

MR. MAHONEY [*sic*]: You mean Rob Seiden?

DETECTIVE GILMA: Yes.

MR. MAHONEY [*sic*]: All right. You got these names right?

DETECTIVE GILMA: Um-hum.

*Id.* at pages 11-12 (numbered in footer as 46-47 of 60).

The transcript continues with continued, persistent calls from the detective to Maloney, with the same demands being made by each side, and the question of whether Maloney is under arrest or is free to leave being debated again.  At one point Maloney again offers to provide the names of other attorneys, but the detective says that she wants "a local guy."

DETECTIVE GILMA: No, Jim, you need to come out and talk to us.

MR. MALONEY: I'm not going to answer the phone unless you will get -- until you get me an attorney, I'm not picking up.

DETECTIVE GILMA: We are working on -- we are getting --

MR. MALONEY: I'm picking up only for that attorney, do you understand me?

-18-

DETECTIVE GILMA: Jim. Jim, we're working on getting the attorney. Do you have any other numbers where we can reach him?

MR. MALONEY: No, but you can get me another attorney.

DETECTIVE GILMA: Is he a local guy?  We don't want somebody that's in Manhattan.

MR. MALONEY: All right. You want to get a local guy.

DETECTIVE GILMA: Yeah. I mean, you're an attorney yourself. You're a smart guy.

MR. MALONEY: Yeah, that's why I know I need a separate attorney, all right? Because my house is surrounded and I didn't do anything wrong and you tell me I didn't do anything wrong.

DETECTIVE GILMA: You didn't but we need to talk about -- everybody's innocent until proven guilty, right?

MR. MAHONEY [*sic*]: Exactly. So why don't you go away and leave me alone --

DETECTIVE GILMA: We have an investigat --

MR. MALONEY: -- and get me an attorney?

DETECTIVE GILMA: We got an investigation going and we need your side of the story, that's all.

MR. MALONEY: All right. Well, right now I don't want to talk because I'm under arrest because my --

DETECTIVE GILMA: You're not under arrest.

MR. MALONEY: Well, yes, I am. I can't leave my house safely.

DETECTIVE GILMA: You can walk out the front door. You can --

-19-

MR. MALONEY: Yeah, and you'll take me and, you know.

DETECTIVE GILMA: We're going to -- we're going to talk to you.

MR. MALONEY: No, you -- we're talking now. Anybody who wants to talk, they talk.

DETECTIVE GILMA: Jim --

MR. MALONEY: Stop it. Stop it.

*Id.* at pages 13-16 (numbered in footer as 48-51 of 60).

As demonstrated in Point I, *supra*, Seiden actively contributed to Maloney's understanding that he (Seiden) was acting as Maloney's counsel, and as the foregoing quoted passages illustrate, had Seiden informed Maloney that he (Seiden) was not acting or speaking on Maloney's behalf but rather as an agent of the police, Maloney would have sought other counsel just as he did when speaking with the detective, who persuaded him to use Seiden because he was a "local guy."

As this Court has already explained,

> In New York, "an attorney-client relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services." *Catizone* [*v. Wolff*], 71 F. Supp. 2d [365,] 368 (quoting *Priest v. Hennessy*, 51 N.Y.2d 62, 68-69, 431 N.Y.S.2d 511, 409 N.E.2d 983 (1980)).  "Formality is not, however, 'an essential element in the employment of an attorney.'"  *Knigge ex rel. Corvese v. Corvese*, No. 01 Civ. 5743(DLC), 2001 WL 830669, at *3 (S.D.N.Y. July 23, 2001) (quoting *Catizone*, 71 F. Supp. 2d at 368). Indeed, "since the initial arrangements for representation are often informal, it is necessary to look at the words and conduct of the parties in determining whether an attorney-client relationship exists.

*Catizone*, 71 F. Supp. 2d at 368.

*Maloney v. County of Nassau*, 623 F. Supp.2d 277, 294 (E.D.N.Y. 2007).

Based on the foregoing test as applied to the facts here, an attorney-client relationship under a fair application of New York law must have existed between Maloney and Seiden during the time-frame of the conversations between Seiden and Maloney that eventually contributed to Maloney's eventually forgoing his Payton rights and surrendering to the police.  The words and conduct of both parties indicated as much.   Accordingly, partial summary judgment should be awarded on the issue of Seiden's liability to Plaintiff on the Fifth Cause of Action as stated in the Amended Complaint.  As this Court has already found, that pleading:

> alleges that, during his telephone conversations with plaintiff, Seiden "professed to be acting on Plaintiff's behalf as plaintiff's attorney," and that plaintiff acknowledged that Seiden was representing him as an attorney. Am. Compl. at ¶¶ 35-36. The Amended Complaint further implies that Seiden advised plaintiff to surrender, and "confirm[ed]" that he "would see to it that no illegal searches or seizures occurred." *Id.* at ¶¶ 40, 42. These factual allegations are sufficient to support a claim predicated on the existence of an attorney-client relationship between plaintiff and Seiden.

*Maloney v. County of Nassau*, 623 F. Supp.2d 277, 294 (E.D.N.Y. 2007).

The Amended Complaint's Fifth Cause of Action, in turn alleges in pertinent part:

97.    Defendant SEIDEN breached his fiduciary and legal

obligations to plaintiff under the New York State Code of Professional
Conduct.

       98.    Defendant SEIDEN breached his common law fiduciary
duty to plaintiff.

       99.    Defendant SEIDEN's breaches of said fiduciary and legal
obligations to plaintiff were intentional.

Amended Complaint (true copy submitted herewith as Exhibit 1 to the Declaration
of Victor M. Serby).

Whatever the police did or did not tell Seiden when, after Maloney had
requested him as his attorney, he joined them to become a member of their
"hostage negotiation team," and whatever Seiden's understanding of his role or
*post-hoc* justification for his behavior may be or have been, his overt acts in
furtherance of the goal of coercing and cajoling Maloney into leaving his home in
the absence of the warrant that Maloney had demanded for some twelve hours
(which, it is submitted, establish Seiden's liability under the separate § 1983
claim, see Point I, *supra*), coupled with Seiden's having actively contributed to
Maloney's (mis)understanding that he (Seiden) was acting as Maloney's counsel
during the telephone conversations (see above), are wholly inconsistent with the
most basic standards of the legal profession.  As the New York Court of Appeals
wrote in 1979:

      It is a long-standing precept of the legal profession that an attorney is

duty bound to pursue his client's interests diligently and vigorously within the limits of the law (Code of Professional Responsibility, canon 7). For this reason, a lawyer may not undertake representation where his independent professional judgment is likely to be impaired by extraneous considerations. Thus, attorneys historically have been strictly forbidden from placing themselves in a position where they must advance, or even appear to advance, conflicting interests . . . .

*Greene v. Greene*, 47 N.Y.2d 447, 451, 391 N.E.2d 1355, 1357, 418 N.Y.S.2d 379, 381 (1979).

Yet Seiden intentionally placed himself in precisely such a position, masquerading as Maloney's attorney for many hours after Maloney had requested his presence in that role, but all the while acting as the agent of the police and to Maloney's direct detriment.  Accordingly, it is submitted that partial summary judgment should also be awarded as to liability on the Fifth Cause of Action stated in the Amended Complaint, with the quantum of damages to be determined at an inquest.

<u>CONCLUSION</u>

For all of the foregoing reasons, partial summary judgment should be awarded in Plaintiff's favor as to Seiden's liability under the § 1983 claim and also as to Seiden's liability under  the Fifth Cause of Action (state-law claim) as stated in the Amended Complaint, with the quantum of damages on each to be determined at an inquest.

Dated:      February 12, 2010
            Woodmere, New York


                                    _____/s/_____
                                    Victor M. Serby, Esq.
                                    *Attorney for Plaintiff*
                                    255 Hewlett Neck Road
                                    Woodmere, NY 11598

                                    (516) 374-2455